STATE OF WEST VIRGINIA

*v.*

MELVIN LOVELESS

(No. 10702)

Submitted April 19, 1955. Decided May 24, 1955.

*D. J. Savage, Harry J. Capehart,* for plaintiff in error.

*John G. Fox,* Attorney General, *Robert E. Magnuson,.*
Assistant Attorney General, for defendant in error.

LOVINS, PRESIDENT:

Melvin Loveless was convicted by a jury in the Circuit Court of Logan County, West Virginia, at the May term, 1954, of that Court, of being an accessory before the fact to the crime of murder in the first degree. The trial court, after overruling a motion to set aside the verdict, sentenced the defendant to be executed.

Defendant was indicted at the May term, 1953, in the Circuit Court of Logan County of two counts, one charging murder and the other charging him with being an accessory before the fact to the crime of murder in the first degree. He pleaded not guilty at the first trial. He was found guilty by a jury of being an accessory before the fact to murder in the first degree and was sentenced to death.

This Court granted a writ of error to that judgment, reversed the judgment of the trial court and remanded the case for a new trial. The opinion of this Court is reported in 139 W. Va. 80 S. E. 2d 442. Reference is here made to that opinion for a statement of additional facts surrounding and relating to the crime of which the defendant was found guilty.

Upon the remand, the defendant was tried in the Circuit Court of Logan County in accordance with the mandate of this Court which trial resulted in a verdict of guilt and a sentence of death, from which the present writ of error is prosecuted.

On or about 2:30 A.M., April 29, 1953, Sarah Reed, a colored woman, was shot and killed in an apartment near the City of Logan, Logan County, West Virginia. The apartment was occupied by Nelson Beatty who at the time of the killing was absent. Sarah Reed was evidently caring for the premises during his absence.

The killing was committed during the commission of a burglary by one of four persons: Albert K. Puckett, Charles Edward Ford, Eugene Sherman or James Rufus Jones. Three of the above named persons were colored.

Puckett is a white man. As hereinafter stated, Melvin Loveless was not present and did not enter the apartment.

The focal point for dissemination of information on which the burglary was planned and the money to be obtained thereby seems to have been Keystone, McDowell County, West Virginia. Nelson Beatty, the owner of the apartment, and those concerned in this crime seem to have gone to that place for the purpose of gambling.

Sometime before the burglary, the defendant, together with Sherman and Ford, went to Logan, West Virginia, for the purpose of ascertaining the location of the Beatty apartment and to make plans for the commission of the crime. Several persons testified that Loveless was seen in the vicinity of the apartment at a club near the Beatty apartment. Ford and Sherman entered the Beatty apartment, went to the bathroom thereof and were reprimanded for such intrusion.

There is some evidence to the effect that either Williams or Puckett, who seem to have lived or been domiciled in Martinsville, Virginia, telephoned to Loveless on April 28, 1953, and shortly before the crime was committed.

Sometime during the day Loveless, Sherman and Ford were seated in an automobile in front of the Loveless Hotel in the City of Charleston. Jones approached them and was accosted by either Sherman or Ford and requested to enter the automobile, which he did, and was there apprised of the proposed burglary. There is no evidence that Loveless did any talking and he denies being present in the automobile. Ford, Sherman, Jones and Loveless occupied the car until the two white men, Williams and Puckett came. They were accosted by one of the occupants of the automobile and they identified themselves as being the persons who had engaged in a telephonic conversation with Loveless. Either Williams or Puckett expressed a desire to eat some food. Loveless went into a nearby restaurant and procured some sandwiches. After the consumption of the food, Williams or Puckett requested Loveless to drive them to a point near

the corner of Clendenin Street and Kanawha Boulevard in the City of Charleston, where they had left the automobile in which they had traveled from Martinsville, Virginia. Sherman, Ford and Jones likewise went along to the automobile of Williams and Puckett. When they reached the automobile, the men separated, some of them getting into the automobile of Williams and Puckett and others remaining in the automobile of Loveless. Then they all traveled to a point near Logan, West Virginia.

Having reached the point near Logan, the automobiles stopped. Either at that point or during the trip to Logan, they stopped and procured an automobile license plate which was to be placed on the Williams-Puckett automobile. After attaching the license plate, Loveless drove his automobile into the town of Logan to reconnoiter the Beatty premise. After a short time, he returned and advised the other five men that the "coast was clear". Upon receipt of that information, the five men went into Logan and four of them entered the apartment of Beatty where the burglary was committed and Sarah Reed shot and killed. Loveless remained at the point where they first stopped as above stated.

When the five men reached a point near the Beatty apartment, Puckett, Ford, Sherman and Jones entered the apartment building. Williams remained in the automobile and seems to have had the motor of the automobile running.

When the four men entered the apartment building, they found the door to apartment number 8 locked. One of the men attempted to break the door down and was unsuccessful, whereupon, Puckett ordered Jones to break open the door. Jones did as he was ordered. They went into apartment number 8 and while there, Sarah Reed asked in words or substance, "Who is there?" One of the persons, Jones, attempted to imitate a woman's voice and said, "It's me." Puckett on the outside, accosted Sarah Reed and said, "What's wrong, lady?" Upon being informed that some people were in apartment number 8, Puckett ostensibly ordered them out of the apartment.

Nevertheless, Puckett entered the apartment and by some means or other was given or obtained a vase or "piggy bank" containing money which he carried out of the apartment into the hall.

Coincidental with Puckett's entrance into the hall, shooting commenced. Sarah Reed evidently fired one shot. A number of other shots were fired by other persons. It is difficult to ascertain from this record who fired the shot that killed Sarah Reed. There is some evidence however that the person who fired the shot was in the hall and the three colored men only fired shots while they were in apartment number 8. Be that as it may, while the shooting was in progress, Puckett, Sherman, Ford and Jones procured approximately $600.00 cash from a cedar chest, a number of watches and one or more firearms; returned to the Williams-Puckett automobile and were transported to the point where they first stopped and where Loveless was awaiting them. At that point, the men separated, some of them getting in the Loveless automobile and some remaining in the Puckett-Williams automobile. All of them returned to Charleston. The Williams-Puckett automobile, on the return trip to Charleston, was driven as fast as it could be and left the "meeting point" before the defendant, Loveless. Nevertheless, the record is clear that the defendant, Loveless, was at the Loveless Hotel in the City of Charleston when the Puckett-Williams automobile arrived. After they returned to Charleston, they went to room number 5 in the Loveless Hotel, where the proceeds of the burglary were distributed among the six men, including the defendant, Loveless. Williams and Puckett, the two white men, remained in the room for the remainder of the night and for some part of the following day when they left Charleston and returned to Martinsville, Virginia.

The defendant denies vigorously that he went to Logan. He admits transporting Sherman, Ford, Williams, Puckett and Jones from a point in front of the Loveless Hotel to a point near the corner of Clendenin Street and the Kanawha Boulevard in the City of Charleston, where he left

them and went to the home of one Patterson, who goes by the suggestive sobriquet of "No Deal". Loveless testified that later on he went to Elmwood Avenue in his automobile and remained there watching the home of his estranged wife until about 2:30 A.M., when he returned to the Loveless Hotel. The burglary in Logan was committed about the hour of 2 or 2:30 A.M.

The defendant testified that Patterson made arrangements for the two white men to have a room at his hotel.

The assignments of error present several questions. First, it is assigned in the petition for a writ of error and in briefs that the trial court erred in overruling a motion for a continuance on the grounds of the absence of a material witness. After this case was argued and submitted, counsel for the defendant moved this Court for leave to withdraw such assignment of error. Notice of such motion was served on the Attorney General of this State. Upon consideration of the motion and the service on the Attorney General, the same is sustained. Necessity for considering or discussing that assignment of error is eliminated.

The defendant moved for a change of venue. He filed a petition and with that petition and in support thereof, he filed 16 affidavits of various citizens of Logan County, the burden of these affidavits being that in their opinion the defendant could not have a fair trial in Logan County on account of the various newspaper articles appearing in the local paper and in the Charleston papers. When the court came to consider the motion for a change of venue, the affidavits above mentioned were filed by the defendant. The state introduced testimony of sixteen witnesses who testified that there was no widespread prejudice against the defendant and gave as their opinions that the defendant could receive a fair trial in Logan County. The trial court, after considering the affidavits and hearing the evidence, overruled the same.

"An application for change of venue in a criminal case is addressed to the sound discretion of the trial judge, and

the burden is upon the prisoner to show good cause for the change. Such good cause must be shown to exist at the time the application is made. Facts and circumstances must be shown satisfying the court that a fair trial cannot be had." Pt. 1, syl. *State* v. *Beale,* 104 W. Va. 617. "It is an established rule in this jurisdiction that the judgment of the circuit court upon such application will not be reversed, unless it plainly appears that there has been a clear abuse of such discretion." Pt. 2, syl., *State* v. *Beale, supra.* See *State* v. *Sheppard,* 49 W. Va. 582, 39 S. E. 676; *State* v. *Powers,* 91 W. Va. 737, 113 S. E. 912; *State* v. *Wisman,* 94 W. Va. 224, 118 S. E. 139; *State* v. *Hively,* 103 W. Va. 237, 136 S. E. 862; *State* v. *Lucas,* 103 W. Va. 743, 138 S. E. 393; *State* v. *Johnson,* 111 W. Va. 653, 661, 163 S. E. 1; *State* v. *Wainwright,* 119 W. Va. 34, 192 S. E. 121; *State* v. *Wooldridge,* 129 W. Va. 448, 40 S. E. 2d 899.

We have carefully examined the proof in support of the motion for a change of venue and the evidence adduced by the state in opposition. We cannot perceive that the trial court abused its discretion in denying a change of venue. The error assigned to overruling a change of venue is not well taken. We discern no error in that respect.

No error is assigned relating to the action of the trial court in giving, refusing and modifying the instructions offered by the state and the defendant. We have examined those instructions with care and although there are a considerable number of objections and modifications made of those instructions, no error in that respect is assigned.

There is some intimation in the briefs and oral arguments that the judge of the trial court treated defense counsel with undue asperity. On examination of this record, it is to be noted that the judge did direct on two or more occasions to counsel for the defense what may be termed a criticism or language tending to show criticism of counsel. A trial judge should be courteous to counsel and refrain from any undue or improper criticism, ever remembering that the action of the judge may influence the jury who hears and observes the same. It is the duty

of the trial court to refrain from any act which tends to show he is a partisan for either the state or the defendant.

Puckett, Ford, Sherman and Jones, at the time of this indictment, were confined in the state penitentiary at Moundsville, West Virginia, Puckett and Sherman having pleaded guilty to an indictment at a former term of the Circuit Court of Logan County, which charged them with murder in the first degree. Ford and Jones were tried by a jury in the same court and found guilty of the crime of murder in the first degree, with a recommendation for mercy. In each case, the Circuit Court of Logan County sentenced all four to confinement for their lives in the state penitentiary at Moundsville, West Virginia. Williams was not tried on account of alleged mental incompetency.

Puckett and Ford were used by the state as witnesses. They were questioned about their sentences and their confinement in the state penitentiary, after which they gave their version of the facts concerning the burglary and the murder. The defendant assigns as error the fact that they were permitted to testify about their status as criminals who had been sentenced for their participation in the crime.

It is well to note that an accessory before the fact may be convicted "* * * whether the principal felon be convicted or not, or be amenable to justice or not, * * *". Code, 61-11-7. Further, "* * * and every accessory before the fact, shall be punishable as if he were the principal in the first degree; * * *". Code, 61-11-6.

At this point, it is to be noted that the defendant in this case was indicted and tried separately as an accessory before the fact.

Accessory before the fact, conspirator and accomplice are terms which are somewhat connected, but not exactly the same from a legal standpoint. An accessory has been defined as: "One, who, being absent at the time a crime is committed, yet assists, procures, counsels, incites, induces, encourages, engages, or commands another to com-

mit it." Black's Law Dictionary, Fourth Edition, page 29. "* * * An accessory is he who is not the chief actor in the offense, nor present at its performance, but is some way concerned therein, either before or after the fact committed. * * *" *State* v. *Roberts,* 50 W. Va. 422, 40 S. E. 484. Absence at the time and place the offense is committed is the essential element to make one an accessory, the connivance and the result aimed at must occur, and the latter must be the effect of the former to complete the crime. *State* v. *Ellison,* 49 W. Va. 70, 38 S. E. 574.

"An 'accomplice' is one who is guilty of complicity in crime charged, either by being present and aiding or abetting in it, or having advised and encouraged it, though absent from place when it was committed, though mere presence, acquiescence, or silence, in the absence of a duty to act, is not enough, no matter how reprehensible it may be, to constitute one an accomplice." Black's Law Dictionary, Fourth Edition, page 33. "The term [accomplice] has been held to include all who are concerned in the crime, whether as principals in the first or second degree, or as accessories, co-conspirators, and in fact all persons who are connected with the crime by unlawful acts, declarations, or ommissions whether antecedent to, contemporaneous with, or subsequent to, the main act constituting the crime." 22 C. J. S., Criminal Law, § 786.

A conspirator in criminal law is one who is guilty of conspiring with one or more persons formed "* * * for the purpose of committing, by their joint efforts, some unlawful or criminal act, or some act which is innocent in itself, but becomes unlawful when done by the concerted action of the conspirators, or for the purpose of using criminal or unlawful means to the commission of an act not in itself unlawful." Black's Law Dictionary, Fourth Edition, page 382. In *State* v. *Wisman, supra,* it is stated that a conspiracy or common purpose may be inferred from the circumstances; preconcert may be shown by circumstances as well as by direct evidence. In *United States* v. *Wilson,* (W. Va.) 23 F. 2d 112, it is held that: "A 'criminal conspiracy' is a confederation to do something unlawful,

either as a means or an end, and consists of a combination of two or more persons by concerted action to accomplish a criminal or unlawful purpose."

In *State* v. *Roberts, supra,* it is held: "A conspirator who is absent at the time the felony is committed, taking no part in the actual commission of the offense, is an accessory before the fact and can only be indicted and punished as such."

The offense of accessory is of two grades: accessory before the fact, and accessory after the fact. We are here concerned only with the former. " 'An accessory before the fact is he that, being absent at the time of the actual perpetration of the crime procures, counsels, commands, incites or abets another to commit it.' * * * The crime of accessory before the fact is a particular one. The absence of the accessory at the time and place of the principal offense is an essential element. * * *" *State* v. *Roberts, supra.*

It is thus seen that there is a logical connection between a conspirator, an accomplice and an accessory before the fact, though we apply the law in this instance to the admission of evidence concerning the criminal act of a principal in the trial of an accessory before the fact. Though it is unnecessary to prove the conviction of the principals, we do not think such testimony was prejudicial to the defendant, as the witnesses, by their own admission of conviction and sentence to the penitentiary, placed the stigma of criminality on themselves. Furthermore, the witnesses had testified to the circumstances surrounding the crime and supplemented such testimony by their statements as to the punishment inflicted on them.

We find no error in permitting Puckett and Ford to testify that they had been convicted of the principal crime and sentenced to the state penitentiary. See *State* v. *Fox* (N. J.) 79 A. 2d 76; *State v. Fiore* (N. J.) 88 A. 1039.

The action of the court in sustaining objections to the questions propounded on cross examination of the witness Puckett shows that counsel actually elicited the informa-

tion from Puckett, sought by the questions. There was no prejudicial error in the action of the court in sustaining the objections to such questions.

Error is assigned by the defendant to the ruling of the court on evidence by Barbara Harris as tendered by the state in rebuttal. Barbara Harris had previously testified in chief for the state. It seems that she was employed by the defendant at his hotel in the City of Charleston. On rebuttal she testified over the objection of the defendant that two men, one named Smith and one Reuben Loveless, came to her and requested that she go to an attorney in the City of Charleston and change a statement she had theretofore made relative to the time the defendant came to the hotel on the night of the commission of the crime. The witness testified she did not go to the attorney. After the evidence was admitted, over objection of defendant, counsel for the defendant moved to strike the evidence of Barbara Harris from consideration of the jury and to instruct the jury to disregard it. The judge of the trial court made the following statement: "Well, there is some connection there, but the court is going to sustain the motion and instruct the jury to disregard it." Thereupon, the defendant moved the court to direct a mistrial on account of such testimony, which motion for a mistrial was overruled. We think this action of the court is palpable error. The testimony of Barbara Harris on rebuttal was inadmissible, since no connection is established between the men who solicited her to change her statement and the defendant. The statement of the court as above quoted tended to minimize the court's action in striking such evidence from the consideration of the jury, although he sustained the motion and directed the jury to disregard it. The evidence of Barbara Harris was clearly prejudicial. The statement of the court in striking such evidence from the consideration of the jury tended to show that the trial court was of the opinion that the evidence was of some value. This, is reversible error.

After the state and the defense had rested, the prosecuting attorney stated that Sherman and Jones, during

their confinement in the state penitentiary at Moundsville, had made contradictory statements, and in view of those statements he, acting for the state, did not intend to use them as witnesses. He also stated that he thought perhaps the defense would put them on the stand, and suggested to the court that the jury would want to hear those two witnesses. Thereupon, the court called Sherman as the court's witness and interrogated him at length, propounding at least 131 questions to the witness. He likewise called Jones as a witness and propounded approximately 172 questions to him. After the court had completed the examination in chief of these two witnesses, the right to cross examine them was accorded to the state and the defendant.

This Court has held that the prosecuting attorney does not owe a duty to examine all of the witnesses who are present at the commission of the alleged offense. *State v. Cain,* 20 W. Va. 679; *State v. Morgan,* 35 W. Va. 260, 270, 13 S. E. 385. In the body of the opinion of the *Cain* case, the Court comments on a number of cases decided in other jurisdictions which in effect held that it was the right of a trial judge, and in some instances his duty, to call witnesses of his own volition. It seems that this rule grew out of situations where the prosecuting officer's action in failing to call such witnesses may have had a tendency to suppress some of the relevant facts.

We have examined a number of cases in other jurisdictions and we think that the principle stated in the *Cain* case is salutary, but should be used cautiously. See *Hill v. Commonwealth* (Va.) 14 S. E. 30; *Pendleton v. Commonwealth* (Va.) 109 S. E. 201. It is to be noted that in the *Pendleton* case, supra, a statute was considered which authorized the trial judge to call witnesses. The principle was approved in *People v. Johnson* (Ill.) 165 N. E. 235, but caution was enjoined upon the trial court. See further, *People v. Rardin* (Ill.) 99 N. E. 59; *Carle v. People* (Ill.) 66 N. E. 32; *Tillman v. State* (Fla.) 44 So. 2d 644. The case of *State v. Horne* (N. C.) 88 S. E. 433, is of interest as throwing light on the subject of the court's calling witnesses of its own motion and thereafter

commenting on evidence so adduced. For a statement of the general rule, see 3 Wharton's Criminal Evidence, §1104; 58 Am. Jur., Witnesses, §4. The danger being that the presiding judge may identify himself either with the prosecution or the defense. We think, that in the instant case, the extent of the examination made by the trial judge tends to indicate that fact.

A trial judge should not intimate directly or indirectly, expressly or by innuendo, his belief in the guilt or innocence of the accused. *State* v. *Hively, supra; State* v. *Wallace,* 118 W. Va. 127, 189 S. E. 104; *State* v. *Austin,* 93 W. Va. 704, 177 S. E. 607; *State* v. *Perkins,* 130 W. Va. 708, 45 S. E. 2d 17. Neither should the trial judge by the extent of his examination invade the province of the jury. In *State* v. *Blair,* 115 W. Va. 549, 552, 177 S. E. 307, it is said: "*** 'The law is peculiarly jealous of any encroachment by a trial court on the province of the jury, who are the exclusive judges of the weight to be attached to the evidence of any witness, and it is error for a court in the trial of the case to intimate any opinion in reference to matters of fact which might in any degree influence the verdict. ***' " *State* v. *Thompson,* 21 W. Va. 741; *State* v. *Austin,* supra. See *State* v. *Shelton,* 116 W. Va. 75, 178 S. E. 633; *State* v. *Justice,* 135 W. Va. 852, 65 S. E. 2d 743.

In this instance, the trial judge, deeming it his duty to call the witnesses, should have confined his examination to a few preliminary questions and should not have conducted a full scale examination of such witness and propounded the following questions:

"The Court: Q. Now, is what you are telling these twelve men now, is that the truth?

A. It's the truth.

Q. You understand that this defendant is on trial here?

A. I understand.

Q. You understand that this Court wants nothing but the truth?

A. I understand that.

Q. What you have just told this jury is the plain truth?

A. It's the truth."

In the court's examination of the witness, Jones, the following question was propounded to this witness:

"Q. Neither side having called you as a witness, the Court is calling you so the Jury may have the benefit of what you know. You were along when this occurred, you admitted your part in the robbery, and you are serving your sentence. Now, the Court has called you and all the Court expects from you is that you tell the truth bearing in mind that Melvin Loveless is on trial for his life or his liberty, and the Court doesn't want any false statements that will help or hurt him. All the Court wants is the truth and that is all this Jury wants."

In so doing, the trial judge invaded the province of the jury, and, we think evinced to the jury his belief in the guilt of the defendant. The witnesses were called after the state and the defense had rested their cases. The introduction of these two witnesses at this stage of the trial was untimely and constitutes another valid objection to the action of the trial court. These witnesses should have been called before the state or the defense had concluded the introduction of testimony to sustain the issue on their respective parts. This record discloses that the trial judge, though having a right to call Sherman and Jones as witnesses, should not have examined them to the extent he did and in the manner he did. Nor should such witnesses and their testimony been used after the state and the defense had rested their case. Such action of the trial court constitutes reversible error.

There is some contention that the prosecuting attorney's statement in words or effect that the defendant had friends in "high places" in his argument to the jury constituted error. We do not see that such argument was prejudicial to the defendant or constitutes any error. We are loathe to interfere with the argument of counsel before a jury. " 'Counsel necessarily have great latitude

in the argument of a case, and it is, of course, within the discretion of the court to restrain them but with this discretion, the appellate court will not interfere, unless it clearly appears from the record that the rights of the prisoner were prejudiced by such line of argument.' " *State* v. *Clifford,* 58 W. Va. 681, 52 S. E. 864. See *State* v. *Shores,* 31 W. Va. 491, 7 S. E. 413; *State* v. *Shawn,* 40 W. Va. 1, 20 S. E. 873; *State* v. *Hayes,* 109 W. Va. 296, 304, 153 S. E. 496. See *State* v. *Simon,* 132 W. Va. 322, 52 S. E. 2d 725.

It is well established in our system of jurisprudence that a defendant in a criminal prosecution, regardless of his status in life, his apparent depravity, the enormity of the crime charged and the probability of his guilt, is entitled to a fair trial in accordance with existing rules and principles of law.

For the reasons herein stated, the judgment of the Circuit Court of Logan County is reversed, the verdict of the jury is set aside and this case is remanded to that court for a new trial.

*Reversed, verdict set aside,
remanded for a new trial.*